**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

**January 2015 Term**

_____

**No. 14-0381**

_____

**FILED**

**June 17, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**WEST VIRGINIA DEPARTMENT OF TRANSPORTATION,
DIVISION OF HIGHWAYS, a public corporation,**
**Petitioner Below, Petitioner**

**v.**

**WESTERN POCAHONTAS PROPERTIES, L.P., a Delaware
Limited Partnership;
WPP, LLC, a Delaware Limited Liability Company; and
BEACON RESOURCES, INC.,**
**Respondents Below, Respondents**

_____

**Appeal from the Circuit Court of Tucker County
The Honorable Lynn A. Nelson, Judge
Civil Action No. 12-C-46**

**REVERSED AND REMANDED**
_____

**Submitted: February 24, 2015
Filed: June 17, 2015**

Leah R. Chappell, Esq.
Adams, Fisher & Chappell, PLLC
Ripley, West Virginia
Counsel for the Petitioner

Lori A. Dawkins, Esq.
Steptoe & Johnson PLLC
Denver, Colorado
Lauren K. Turner, Esq.
Steptoe & Johnson PLLC
Bridgeport, West Virginia
Counsel for Respondent
Beacon Resources, Inc.

**David H. Wilmoth, Esq.**
**Elkins, West Virginia**
**Jeffrey S. Zurbuch, Esq.**
**Busch, Zurbuch & Thompson, PLLC**
**Elkins, West Virginia**
**Counsel for Respondents**
**Western Pocahontas Properties, LP and**
**WPP, LLC**

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**JUSTICE LOUGHRY dissents and reserves the right to file a separate opinion.**

SYLLABUS BY THE COURT

1.      The measure of just compensation to be awarded to one whose interest in real estate is taken for a public use in a condemnation proceeding is the fair market value of the property at the time of the taking.

2.      In a condemnation action, the amount of raw profit lost from a business operated either on the condemned real estate or on its residue may not be the sole basis to establish just compensation.  Stated another way, business profits lost as a result of a condemnation action may not be recovered as an independent element of damages.

3.      In a condemnation action, under the income capitalization approach to appraisal, an expert witness's assessment of the income stream that real property produces may be relied upon to support a fair market valuation of an interest in real estate.  Generally, the income capitalization approach weighs the anticipated income stream from the real estate as an element of fair market value, as of the date of taking, and accounts for likely forces and events in the market that would affect the revenue, expenses, and net operating income of the real estate interest.

4.      "The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong."  Syllabus Point 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991).

Justice Ketchum:

It is a well-established rule in the law of eminent domain that a jury may not award just compensation for the lost profits of a business on land taken by condemnation.[1]  However, in this appeal of a jury's $24 million verdict in a condemnation case, a litigant testified and valued his interest in a tract of condemned land using only the future lost profits of his business.  Despite this evidence, the Circuit Court of Tucker County refused to instruct the jury to disregard lost business profits when calculating just compensation.

As set forth below, we reverse the circuit court's judgment on the jury's verdict, and remand the case for a new trial.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

Respondents Western Pocahontas Properties, L.P., and WPP, LLC (collectively "Western Pocahontas") own several tracts of land in Tucker County, West Virginia.  There is mineable coal[2] beneath this land.

---

[1] "Eminent domain" is the legal term for the inherent power of a government entity to take private property for public use.  *Black's Law Dictionary* 637 (10th ed. 2014).  "Condemnation" is the legal proceeding filed by a government entity in the exercise of its eminent domain power to take private property for public use.  *Id.* at 353.

[2] Mineable coal is that which "could be profitably mined by judicious methods." *William C. Atwater & Co. v. Fall River Pocahontas Collieries Co*., 119 W.Va. 549, 556, 195 S.E. 99, 102 (1937).

On June 21, 2011, Western Pocahontas leased 187 acres of its land to respondent Beacon Resources, Inc. ("Beacon"). The lease allowed Beacon to extract the coal in exchange for royalty payments to Western Pocahontas.[3] Shortly thereafter, in July or August, Beacon opened a surface mine on the land and began removing coal.

On August 15, 2011, Beacon signed a contract to sell coal to a neighboring mine;[4] the contract expired by its own terms on March 31, 2012. Beacon claims it did not renew the contract because it learned some of the land would be taken through condemnation to build a highway and did not believe it would be able to fulfill the contract. However, Beacon continued to mine and sell coal for several months thereafter.

In April 2012, petitioner West Virginia Department of Transportation, Division of Highways ("the DOH") filed a condemnation action against Western Pocahontas and Beacon. The DOH sought to take approximately 30 of the 187 acres owned by Western Pocahontas and leased to Beacon to construct a portion of the Corridor H highway.[5]

---

[3] Beacon signed a lease with Western Pocahontas in January 2010, but never acted to begin mining operations. The parties agree it required payment of an 8% royalty. The June 2011 lease reduced the royalty to 7.5%.

[4] The nearby mine paid Beacon a wholesale price, and would transport, wash, clean and sort the coal. The nearby mine would then sell the coal at market prices.

[5] Corridor H is a result of the "Appalachian Regional Development Act of 1965," adopted by Congress to stimulate economic development in Appalachia. 40 U.S.C. § 1401, et seq. One feature of the Act was the creation of the "Appalachian development highway system" to create a network of local access roads in the mountainous terrain. *See* 40 U.S.C. § 14501. Pursuant to the Act, the Appalachian Regional Commission "approved a plan for a 13-state regional highway system that

(continued . . .)

On July 25, 2012, the circuit court granted the DOH the right to take possession of the 30 acres of land. Around this same time, Beacon halted all mining operations on the entire 187 acres and began selling its equipment.

As required by law,[6] on July 25, 2012, the DOH deposited $750,000 with the circuit clerk as its estimate of just compensation for the surface of the land taken; Western Pocahontas later accepted that valuation of the surface. However, the DOH also deposited $5,863,100 as the DOH's estimate of just compensation for the coal underlying the 30 acres of land taken. Beacon objected to the DOH's valuation of the coal, specifically the value of Beacon's lease to extract and sell the coal beneath the surface.

A three-day jury trial was held in July 2013 to establish the just compensation value for Beacon's leasehold interest in the coal taken by the DOH, as of July 25, 2012. The trial centered on two issues.

The first issue at trial concerned the amount of land affected by the DOH's take. The DOH asserted it was taking only about 30 of the 187 acres leased by Beacon, and that the remaining 157 acres of coal reserves would be unaffected by the construction

---

called for the establishment of 23 corridors, each of which would contain a highway that would permit anticipated traffic to proceed in safety between major termini at an average speed of 50 miles per hour, commensurate with the terrain." *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 370 (D.C. Cir. 1999). Corridor H was designed by the Commission to extend from Interstate 79 near Weston, West Virginia, eastward to Interstate 81 near Strasburg, Virginia. *Id.*

[6] *See W.Va. Code § 54-2-14a [1981].*

of the highway. The DOH's experts therefore testified that Beacon was only entitled to just compensation for the 30 acres expressly encompassed by the take.

Beacon, however, argued that it was also entitled to compensation for the damage to the "residue," that is, the coal reserves beneath the remaining 157 acres covered by the lease. Beacon argued that the construction of the highway sterilized and made un-mineable the coal that remained on the leasehold.[7] At the time of trial, Beacon had ceased mining operations and sold all of its equipment because, it claimed, it could no longer profitably mine the coal in its lease.

For purposes of this appeal, the second and more important issue disputed by the parties concerned the fair market valuation of Beacon's lease. The president of Beacon, Jason Svonavec, testified that, because of the *profits* he would lose from the DOH's taking, the fair market value of the 187-acre lease was $84 million. Mr. Svonavec based his valuation on Beacon's contract to sell coal dated August 15, 2011. The contract set a price of $120.00 per ton for metallurgical coal, which Mr. Svonavec claimed made up 90% of the coal mined by Beacon. The contract also set a price of $46.00 per ton for steam coal, which Mr. Svonavec said made up the remaining 10% of

---

[7] Beacon's witnesses essentially testified that, where the DOH intended to build the highway, the "overburden" (made of topsoil, clay, and rock) that was atop the coal was relatively thin, only 50-70 feet thick, but that the overburden was nearly 170 feet thick on the residue. Beacon's witnesses said that when Beacon had the entire 187 acres, it could economically shuffle the overburden material from one place to another on the land and profit from selling the coal. However, with the highway constructed there was insufficient space to safely blast away and move the thick overburden, and the witnesses opined that it would be unprofitable (and therefore impossible) to continue operations to remove the remaining coal.

4

sales. Mr. Svonavec estimated that there are 525,244 tons of coal under the acreage taken by the DOH, and another 1,000,000 tons or so of now-unmineable coal in the residue. Mr. Svonavec further estimated that his mine was operating at about an 80% "recovery" rate, meaning that 80% of the coal mined was usable and marketable while the remaining 20% could not be sold because it was contaminated with rock and other materials.

Mr. Svonavec testified that he based his valuation of Beacon's lease solely on the $120.00 per ton sale price of the recoverable metallurgical coal, less production costs, and concluded that Beacon earned a profit of $65.00 on every single ton of coal sold. Mr. Svonavec confirmed that the $65.00 figure was his "profit margin on that coal" and was purely "profit per ton." Assuming that each ton of recoverable coal would earn Beacon $65.00 in profit, Mr. Svonavec testified that just compensation from the DOH would be $27 million for the area taken to build the highway and $57 million for the residue, a total of $84 million.

Beacon also offered the expert testimony of an appraiser on valuation. The appraiser's opinion likewise started with the assumption that Beacon sold all of the recoverable coal for $120.00 per ton, and that after production costs was left with about $65.00 in "gross profit to the leaseholder." This appraiser, whose opinion we discuss later, suggested that just compensation for Beacon's coal lease would be $48 million.

At trial, a problem arose when the DOH offered an expert valuation of Beacon's lease through a mining engineer, Thomas Gray. Mr. Gray intended to offer a valuation opinion derived from "comparable sales" of coal mining properties. However, Beacon moved to exclude Mr. Gray's comparable sales opinion because it was based

5

solely upon newspaper articles and internet press releases. As we discuss later in this opinion, Mr. Gray did nothing to investigate the terms of these supposed comparable sales, or whether the sales were arms-length transactions. The circuit court agreed with Beacon and prevented Mr. Gray from testifying about comparable sales.

Still, the circuit court did permit Mr. Gray to testify that the value of the coal taken was only $2,355,266,[8] although how this number was reached is not clear from Mr. Gray's testimony. It appears that, unlike Beacon's witnesses, Mr. Gray did not value the coal based upon its anticipated $120.00 per ton contract price; instead, he relied upon Beacon's reports of actual monthly sales. These reports showed Beacon's monthly sales varied from an average high price of $116.82 per ton in August 2011, to a low of $60.67 per ton in July 2012. Furthermore, based on his experience as a mining engineer, Mr. Gray testified that just compensation should be paid only for coal within the 30-acre area taken; he testified the coal reserves under the residue could be profitably mined after the DOH's construction of the highway.

At the close of the trial, the DOH proposed a jury instruction telling the jury that it "may not consider any lost profit" to Beacon's business when it calculated the damages to award as just compensation. The proposed "business profits" jury instruction was based on an axiom of eminent domain law which holds that "[t]he amount of profit

---

[8] The engineer also testified that Beacon was entitled to an additional $113,000 to allow for revisions to its mining permits, and as compensation to construct new roads and new erosion and sediment controls. This additional money would assist Beacon in mining the coal beneath the 157-acre residue.

6

earned from a business conducted on the condemned property is ordinarily not admissible in evidence."[9] However, upon an objection by Beacon, the circuit court refused to give the jury the DOH's proposed instruction about business profits.

Thereafter, the jury returned a verdict awarding Western Pocahontas and Beacon the sum of $24 million as just compensation for the mineral interest acquired by the DOH and for damages to the residue.

The DOH subsequently made a motion for a new trial. The DOH asserted, inter alia, that the circuit court erred when it refused to instruct the jury not to consider the lost business profits earned by Beacon. The circuit court, however, said that the instruction was properly refused and was "not relevant to the evidence presented at the trial" because "[n]o specific evidence was presented regarding the business profits" of Beacon. The DOH also asserted that the trial court erred in striking Mr. Gray's expert testimony about comparable sales; the circuit court disagreed, finding the "nature of his comparables" to be unverified and unreliable. In two orders dated February 4, 2014, the circuit court denied the motion for a new trial and entered judgment against the DOH.[10]

The DOH now appeals the circuit court's orders.

---

[9] 5 Julius L. Sackman et al., *Nichols on Eminent Domain* § 19.06[1] (3d ed. 2014). *See also* Syllabus Point 14, *Buckhannon & N.R. Co. v. Great Scott Coal & Coke Co.*, 75 W.Va. 423, 83 S.E. 1031 (1914); Syllabus Point 1, *Gauley & E. Ry. Co. v. Conley*, 84 W.Va. 489, 100 S.E. 290 (1919).

[10] The circuit court's judgment was for $18,136,900, which was the jury's verdict less the deposit paid to the circuit clerk by the DOH at the time of the take. Prior to trial, Beacon and Western Pocahontas entered into an agreement dividing any judgment; that agreement was not made a part of the record.

## II.
## STANDARD OF REVIEW

When reviewing a circuit court's decision on a motion for a new trial, we have held that

> "[t]he ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, in part, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

Syllabus Point 2, *Estep v. Mike Ferrell Ford Lincoln–Mercury, Inc*., 223 W.Va. 209, 672 S.E.2d 345 (2008). However, while we give great deference to a circuit court's overall decision concerning a new trial, "we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." *Tennant v. Marion Health Care Found., Inc*., 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995).

## III.
## ANALYSIS

The DOH asserts it is entitled to a new trial on two grounds. First, it argues that the circuit court erred in refusing to give its proposed jury instruction about lost business profits, and thereby allowed the jury to consider Beacon's profit margin on coal as a basis for just compensation. Second, the DOH argues that the circuit court abused its discretion when it excluded Mr. Gray's expert testimony about comparable sales used in the valuation of Beacon's leasehold interest.

8

Before we turn to these two assignments of error, we must first set forth the general guidelines for condemnation proceedings.

Both the United States and West Virginia Constitutions require the State to provide "just compensation" to the owner of an interest in real estate[11] taken through the State's exercise of the power of eminent domain.[12] Historically, what constitutes just

---

[11] The term "real estate" is usually thought of as "land," but is more broadly defined as follows:

> Real estate is the physical land and appurtenances affixed to the land – e.g., structures. Real estate is immobile and tangible . . . [and] includes the following tangible components:
>
> - land
>
> - all things that are a natural part of land, such as trees and minerals
>
> - all things that are attached to land by people, such as buildings and site improvements
>
> In addition, all permanent building attachments (for example, plumbing, electrical wiring, and heating systems) as well as built-in items (such as cabinets and elevators) are usually considered part of the real estate. Real estate includes all attachments, both above and below the ground.

The Appraisal Institute, *The Appraisal of Real Estate* 3-5 (14th ed. 2013).

[12] The Fifth Amendment to the United States Constitution provides, "nor shall private property be taken for public use, without just compensation." Article III, section 9 of the West Virginia Constitution provides:

> Private property shall not be taken or damaged for public use, without just compensation; nor shall the same be taken by any company, incorporated for the purposes of internal improvement, until just compensation shall have been

(continued . . .)

compensation has been an elusive question, one that "cannot be reduced to inexorable rules[.]"[13] Suffice it to say that one whose real estate is taken is entitled to just compensation for "the value of the land taken at the time of taking, and to damages to the residue,"[14] and that "the value of the land taken and the damage to the residue are necessarily matters of opinion."[15]

The measure of just compensation to be awarded to one whose interest in real estate is taken for a public use in a condemnation proceeding is the fair market value of the property at the time of the taking.[16] The market value must be fair not only to the

---

paid, or secured to be paid, to the owner; and when private property shall be taken, or damaged, for public use, or for the use of such corporation, the compensation to the owner shall be ascertained in such manner, as may be prescribed by general law; provided, that when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders.

The power of eminent domain is not conferred by constitution or statute; it is an inherent attribute of state sovereignty. *State ex rel. Dep't of Natural Res. v. Cooper*, 152 W.Va. 309, 312-13, 162 S.E.2d 281, 283 (1968). The purpose of article III, section 9 is to establish limitations on the exercise of this inherent power.

[13] *W.Va. Dep't of Highways v. Berwind Land Co.*, 167 W.Va. 726, 732, 280 S.E.2d 609, 613 (1981) (quoting *U.S. v. Toronto, Hamilton and Buffalo Navigation Co.*, 338 U.S. 396, 402 (1949).

[14] *Buckhannon & N.R. Co. v. Great Scott Coal & Coke Co.*, 75 W.Va. at 442, 83 S.E. at 1038.

[15] *Tennessee Gas Transmission Co. v. Fox*, 134 W.Va. 106, 112, 58 S.E.2d 584, 589 (1950).

[16] *W.Va. Dep't of Highways v. Berwind Land Co.*, 167 W.Va. at 732, 280 S.E.2d at 613. *See also*, *Foster v. United States*, 2 Cl.Ct. 426, 446 (1983) ("In most cases
(continued . . .)

owner of the interest in the condemned real estate, but also fair to the public paying for the acquisition.[17] The fair market value of the property taken has been defined as: "[T]he price for which the land could be sold in the market by a person desirous of selling to a person wishing to buy, both freely exercising prudence and intelligent judgment as to its value, and unaffected by compulsion of any kind."[18]

---

the question of just compensation can be answered by the ascertainment of market value – what a willing buyer would pay in cash to a willing seller."). *But see*, *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 633 (1961) ("In many cases . . . [just compensation] can readily be served by the ascertainment of fair market value . . . But this is not an absolute standard nor an exclusive method of valuation."); *United States v. 564.54 Acres of Land*, 441 U.S. 506, 512 (1979) ("[T]his Court has refused to designate market value as the sole measure of just compensation. For there are situations where this standard is inappropriate.").

[17] *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991) ("'Just compensation' is that amount of money necessary to put a landowner in as good a pecuniary position, but no better, as if his property had not been taken. . . . No citizen has a right . . . to reap a windfall from the public treasury because his land must be taken. Overcompensation is as unjust to the public as undercompensation is to the property owner."); *State Rd. Comm'n v. Bd. of Park Comm'rs*, 154 W.Va. 159, 167-68, 173 S.E.2d 919, 925 (1970) ("The guiding principle of just compensation is reimbursement to the owner for the property taken and he is entitled to be put in as good a position pecuniarily as if his property had not been taken. . . . He must be made whole but is not entitled to more.").

[18] Syllabus Point 5, *Wheeling Elec. Co. v. Gist*, 154 W.Va. 69, 173 S.E.2d 336 (1970). *See also*, Syllabus Point 2, *Guyandotte Valley Ry. Co. v. Buskirk*, 57 W.Va. 417, 50 S.E. 521 (1905) (same); *W.Va. Dep't of Highways v. Sickles*, 161 W.Va. 409, 411, 242 S.E.2d 567, 569-70 (1978) ("what a willing buyer, desirous of buying but under no compulsion to buy would pay to a willing seller, desirous of selling but under no compulsion to sell."). The *Uniform Appraisal Standards for Federal Land Acquisitions* gives the following definition:

> Market value is the amount in cash, or on terms reasonably
> equivalent to cash, for which in all probability the property
> would have sold on the effective date of the appraisal, after a

(continued . . .)

Where the State condemns only a portion of a tract of real estate and leaves a smaller tract as residue, there may be damages to the residue. The difference in the fair market value of the residue immediately before and immediately after the taking is the proper measure of just compensation.[19]

The challenge in assessing just compensation in a condemnation case is this: what uses and factors would be considered in setting the market price by a willing buyer and a willing seller, each acting with complete freedom and knowledge of the property? "[E]very element of value which would be taken into consideration between private parties in a sale of property should be considered in arriving at a just compensation for the land proposed to be taken[.]"[20] Conversely, "[c]onsiderations that

reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal.

Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions* 30 (2000).

[19] *See* Syllabus Point 3, *W.Va. Dep't of Highways v. Bartlett*, 156 W.Va. 431, 194 S.E.2d 383 (1973) ("The approved and general rule for the measure of damages in an eminent domain proceeding where parts of the land are taken is the fair market value for the land at the time it was taken, plus the difference in the fair market value of the residue immediately before and immediately after the taking less all benefits which may accrue to the residue from the construction of the improvement for which the land was taken.").

[20] Syllabus Point 1, *Norfolk & W. Ry. Co. v. Davis*, 58 W.Va. 620, 52 S.E. 724 (1906).

may not reasonably be held to affect market value are excluded."[21]  Essentially, any

factor that a reasonable buyer or seller would typically consider should be included in an

analysis of fair market value.[22]

Thus, for the purpose of determining the market value of property taken by

eminent domain,

> consideration should be given to every element of value
> which ordinarily arises in negotiations between private
> persons with respect to the voluntary sale and purchase of
> land, the use made of the land at the time . . . it is taken, its
> suitability for other uses, its adaptability for every useful
> purpose to which it may be reasonably expected to be
> immediately devoted, and the most advantageous uses to
> which it may so be applied.[23]

Finally, whatever uses and factors are considered, "the date of take for the

purpose of determining the fair market value for the fixing of compensation to be made to

---

[21] *United States v. Sowards*, 370 F.2d 87, 90 (10th Cir. 1966).

[22] *United States v. Land in Dry Bed of Rosamond Lake*, Cal., 143 F. Supp. 314, 320 (S.D. Cal. 1956). *See also*, *Cade v. United States*, 213 F.2d 138, 140-41 (4th Cir. 1954) ("The witness testified to the value of the land . . . This is the way that any man of intelligence would have arrived at a valuation of the property for ordinary business purposes and we know of no reason why a witness testifying under oath as to his opinions should not arrive at a valuation in the same way. . . . Certainly such matters would be considered by any business man in selling, buying or valuing the property; and when the court adopts the standards of the market place in making valuations there is no reason why it should close its eyes to how the market place arrives at and applies the standards. . . . It is difficult to perceive why testimony, which experience has taught is generally found to be safely relied upon by men in their important business affairs outside, should be rejected inside the courthouse." (Citations omitted.)).

[23] *W.Va. Dep't of Highways v. Berwind Land Co.*, 167 W.Va. at 733, 280 S.E.2d at 614 (quoting Syllabus Point 7, in part, *Strouds Creek & M. R. Co. v. Herold*, 131 W.Va. 45, 47, 45 S.E.2d 513, 516 (1947)).

the condemnee is the date on which the property is lawfully taken by the commencement of appropriate legal proceedings[.]"[24]

## A. *Business Profits as an Indicator of Land Value*

The DOH's first assignment of error is that the circuit court improperly rejected the DOH's proposed instruction on business profits and failed to correctly instruct the jury on the law. The proposed instruction told the jury to disregard "any lost profit or damage or injury to any business" in its calculation of just compensation, "because such damages depend on contingencies too uncertain and speculative to be allowed."

When a party alleges a trial court failed to give the jury a correct statement of the law, our review is *de novo.* As we said in *State v. Hinkle*:

> As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By

---

[24] Syllabus Point 1, *W.Va. Dep't of Highways v. Roda*, 177 W.Va. 383, 352 S.E.2d 134 (1986).

There is an exception, however, when the condemnor's prior actions – such as by condemning surrounding properties or threatening future condemnation of the subject property – have directly decreased the value of the condemnee's property. In such cases, the condemnee "is entitled to an evaluation of his property that comports with the peculiar facts and circumstances of the case." *Huntington Urban Renewal Auth. v. Commercial Adjunct Co.,* 161 W.Va. 360, 366, 242 S.E.2d 562, 566 (1978). When the condemnor acts to take the property, the decrease in the fair market value of real property prior to the date of valuation caused by the condemnor's previous actions "should be disregarded in any determination of just compensation to be awarded the property owner for the property." Syllabus*, Id.*

14

contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*.[25]

Under this standard, a trial court has broad discretion in its formulation of a jury charge, particularly "concerning the specific wording of the instruction[.]"[26] However, whatever wording is chosen, "[a] trial court's instructions to the jury *must be a correct statement of the law and supported by the evidence*."[27]

Beacon asserts that this is not a lost profits case and, therefore, that the DOH's proposed instruction on business profits was not relevant to the evidence at trial. Beacon argues that because this case involves a lease of coal reserves, the only proper measure of value is in the ability of those reserves to produce income. Beacon claims that it does "not seek lost profits as consequential damages" but rather "seek[s] the value of their coal which is measured by the dollar amount for which they could sell it."[28]

The DOH, however, asserts that the circuit court's instructions to the jury were not a correct statement of the law, because the instructions failed to account for the evidence of raw business profits, and opinions based on those raw profits, adduced at trial. The DOH asserts that Beacon's witnesses repeatedly discussed Beacon's business profits as the sole basis for valuations of just compensation for its real property interests.

---

[25] Syllabus Point 1, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996).

[26] Syllabus Point 4, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

[27] *Id.* (emphasis added).

[28] *Whitney Benefits, Inc. v. United States*, 18 Cl. Ct. 394, 409 (1989).

15

For instance, the president of Beacon testified the jury should award $84 million in just compensation because his company was losing $84 million in future profits. The DOH points out that, for over a century, the law of this State has prohibited juries from directly considering business profits in assessing just compensation. The DOH therefore argues that the circuit court erred as a matter of law when it refused to instruct the jury that Beacon's future business profits lost as a result of the condemnation were not recoverable. It also argues the circuit court erred when it concluded that "no specific evidence regarding the business profits" of Beacon was introduced. We agree, and on this ground find that the DOH is entitled to a new trial.

Since 1885, the law of this State has been clear: the raw profit lost from a business conducted on property condemned by the government's exercise of eminent domain may not be the sole consideration in establishing just compensation. In *Shenandoah Valley Railroad Co. v. Shepherd*, this Court set aside a jury's verdict in a condemnation action because it included future losses to a business.[29] We emphasized that it is the real estate which is appropriated, not the business. As another court stated more eloquently, "[t]he reasoning behind these cases is that the business itself is not being condemned and the business can be relocated elsewhere."[30]

---

[29] Syllabus Point 2, *Shenandoah Valley Railroad Co. v. Shepherd*, 26 W.Va. 672 (1885).

[30] *Auraria Businessmen Against Confiscation, Inc. v. Denver Urban Renewal Auth.*, 183 Colo. 441, 446, 517 P.2d 845, 848 (1974).

16

We have expounded upon our holding in *Shepherd* and held that evidence showing "past annual profits derived from a business conducted on the [condemned] property . . . offered as an index to the market value of the property, is ordinarily inadmissible[.]"[31] "While it is proper to show how the property is used, as an element of value, it is incompetent to go into the question of profits, derived from the business carried on upon it."[32] The reason evidence of "[l]oss of profits to business" is generally inadmissible is because those profits are "too remote and speculative to be the subject of jury consideration."[33] "[T]he extent to which such income arises out of the property used is uncertain," and is greatly affected by "the capital invested, business conditions obtaining and the trading skill and business capacity of the owner, as well as adaptability of the property to the business."[34]

The general rule precluding compensation for lost profits of a business on condemned land continues to be recognized today.[35] "As a general rule, there is no

---

[31] Syllabus Point 1, in part, *Gauley & E. Ry. Co. v. Conley*, 84 W.Va. at 489, 100 S.E. at 290. *See also*, *State, by State Rd. Comm'n v. Darnall*, 129 W.Va. 159, 161, 38 S.E.2d 663, 665 (1946) ("[T]he matters . . . of past or future profits from business conducted upon the property taken, are held to be irrelevant.").

[32] *Buckhannon & N.R. Co. v. Great Scott Coal & Coke Co.*, 75 W.Va. at ___, 83 S.E. at 1040.

[33] *Id*.

[34] Syllabus Point 1, in part, *Gauley & E. Ry. Co. v. Conley*, 84 W.Va. at 489, 100 S.E. at 290.

[35] "With remarkable unanimity the American jurisdictions hold that evidence of profits derived from a business conducted on property is too speculative,

(continued . . .)

17

compensation for frustrated contracts or for loss of future [business] income."[36]  The

treatise *Nichols on Eminent Domain* states plainly, "The amount of profit earned from a

business conducted on the condemned property is ordinarily not admissible in

evidence."[37]

> This general rule is based upon two considerations: First, in most states, loss of business, goodwill and profits are not compensable in eminent domain proceedings, so that admission into evidence of profits is thought to lead the jury to an improper award.  Secondly, business profits are thought to depend so much upon the capital employed and the future, skill and management of the business, that they furnish little test of the value of the real estate itself.  The profits of a business are too uncertain, and depend on too many contingencies to be accepted as evidence of the usable value of the property upon which the business is carried on.  Profits depend upon the times, the amount of capital invested, the social, religious and financial position in the community of the one carrying it on, and many other elements which might be suggested.[38]

The treatise emphasizes the ephemeral[39] nature of business profits this way: "What one

man might do at a profit, another might only do at a loss.  Further, even if the owner has

---

uncertain, and remote to be considered as a basis for computing or ascertaining the market value of the property in condemnation proceedings."  "Profits derived from business conducted on property taken by eminent domain as evidence of market value," 7 A.L.R. 163 (1920).

[36] *Foster v. United States*, 2 Cl.Ct. at 445.

[37] 5 *Nichols on Eminent Domain* at § 19.06 [1].

[38] *Id.*

[39] *Auraria Businessmen Against Confiscation, Inc. v. Denver Urban Renewal Auth.*, 183 Colo. at 446, 517 P.2d at 848 ("Financial success in business is also

(continued . . .)

made profits from the business in the past it does not necessarily follow that these profits will continue in the future."[40]

Most importantly, just compensation cannot be based upon the pure lost profits of a business because that approach disregards market realities. Not only does it assume stable demand, competition, and production costs, but it also fails to account for risks and uncertainties in the operation of a business. Put simply, no reasonable buyer or seller would place a fair market value on a tract of real estate based solely upon the future profit of a business located on the real estate. No reasonable buyer would have paid Beacon $84 million today for its 187-acre lease – and the accompanying costs, risks and uncertainties – for the future right to earn only $84 million selling the coal reserves.

### B. *The Income Approach to Valuation of Real Estate*

As we have emphasized, just compensation for condemned real estate should reflect the unfettered motivations of the market. Every element that private parties would consider in a sale of real estate should be weighed in setting a just compensation for that real estate in a condemnation action, and considerations that would not reasonably affect market value are excluded.

---

too ephemeral and is tied to considerations involving the type of business which is being conducted, management, and a variety of other factors which are not tied to the land.").

[40] 5 *Nichols on Eminent Domain* at § 19.06 [1].

No reasonable buyer would set a fair market value for real estate solely upon the pure profit of a business located upon the real estate. However, if the real estate is being purchased as an investment, the earning power of the land may be a critical element that affects the buyer's and seller's calculation of the market value. When the tract of real estate *itself* generates income – such as through the rental of the land, rental of buildings upon the land, or the extraction of crops, timber or minerals – that income may be considered in a condemnation action through an appraiser's use of the "income capitalization approach" to valuing real estate.

The distinction between future profits of a business on real estate, and the future earning power of the real estate itself may seem subtle; it is, in fact, a powerful tool for calculating a fair market valuation of the real estate. Income from a business on the land is connected to the business; if the business moves, the income moves. Income from the real estate itself derives from qualities inherent only to that tract of real estate, whether from the quality of crops grown there, the rents from buildings, or the minerals that can be extracted from beneath the land.

An appraiser may, in part, rely upon the future income stream from the real estate to calculate a fair market value through use of the "income capitalization approach." This appraisal approach "consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income . . .) and convert these benefits into an

20

indication of present value."[41]  It allows future income generated by the real estate to be mathematically "capitalized" in ways that reflect future risks, inflation, and other factors to calculate a fair market value that would be accepted by a reasonable buyer and reasonable seller.  Understanding this approach to valuation requires understanding of the art of property appraisal.

In the field of real property appraisal, there are three general approaches to establishing the fair market value of real estate.  These three techniques in the hands of an expert appraiser are designed to provide some estimation of the fair market value of real estate:

> 1.  In the cost approach, value is estimated as the current cost of reproducing or replacing the improvements . . . minus the loss in value from depreciation, plus land value.
>
> 2.  In the sales comparison approach, value is indicated by recent sales of comparable properties in the market.
>
> 3.  In the income capitalization approach, value is indicated by a property's earning power, based on the capitalization of income.[42]

---

[41] *The Appraisal of Real Estate* at 439.

[42] *The Appraisal of Real Estate* at 36.  *See also*, *W.Va. Dep't of Highways v. Sickles*, 161 W.Va. at 411, 242 S.E.2d at 570 ("There are three fundamental techniques which are used in the appraisal of real estate. . . . The first of these approaches is known as the market approach and involves, essentially, an evaluation of similar pieces of property in the general area and the prices paid for each.  The second approach is the cost approach and is used primarily where there are recently constructed improvements whose cost of construction or cost of replacement is readily ascertainable.  The third is the income approach, and this is used where the property has a rental value which can be capitalized to give some fair indication of what an investor would pay for the privilege of receiving that income over some foreseeable period of time."); *Uniform Standards of*

(continued . . .)

The cost approach to valuation generally consists of the calculation of a depreciated replacement cost for improvements on the land, plus the value of the land, as evidence of market value.[43] The comparable sales or "market" approach involves, "essentially, an evaluation of similar pieces of property in the general area and the prices paid for each."[44]

---

*Professional Appraisal Practice*, Standards Rule 1-4 (2014-2015 ed.); Trevor R. Ellis, "U.S. Views on Valuation Methodology, Part 2 of 3," 39 *The Professional Geologist* 18, 19 (July 2002) ("The *Sales Comparison Approach* is often also called the Market Approach or Market Method by Business valuers and non-U.S. valuers. It is based primarily on the Principle of Substitution. The *Cost Approach* is based mainly on the Principle of Contribution to Value. The *Income Approach* is based on the Principle of Anticipation of Benefits. [The International Valuation Standards] has labelled this third Approach the *Income Capitalisation Approach*."); International Valuation Standards Council, *International Valuation Standards 2013*, Definitions (2013) (The cost approach "provides an indication of value using the economic principle that a buyer will pay no more for an asset than the cost to obtain an asset of equal utility, whether by purchase or by construction." The sales comparison approach (or market approach) "provides an indication of value by comparing the subject asset with identical or similar assets for which price information is available." The income approach provides an indication of current value "by converting future cash flows to a single current capital value.").

[43] *Cloverport Sand & Gravel Co. v. United States*, 6 Cl.Ct. 178, 189 (1984).

[44] *Id.* In Syllabus Point 1 of *W.Va. Department of Highways v. Brumfield*, 170 W.Va. 677, 295 S.E.2d 917 (1982), we adopted the following guidelines for the admissibility of comparable sales:

> The general rule is that evidence of the price paid for property which is comparable to the property being condemned is admissible, if the following conditions are satisfied:
>
> (a) The sale must be bona fide;
>
> (b) The sale must be voluntary, not forced;
>
> (c) The sale must have occurred relevantly in point of time; and

(continued . . .)

And the income approach is typically used where the condemned real estate *itself* generates future income "which can be capitalized to give some fair indication of what an investor would pay for the privilege of receiving that income over some foreseeable period of time."[45]

Calculating a fair market value of mineral bearing land involves many assumptions and much speculation and, therefore, "all three Approaches [to valuation] suffer from limitations in their application and are subject to severe criticism."[46] Hence, to the extent possible, "[m]ore than one Approach should be used if possible, to provide validation"[47] or a "sanity check"[48] on an appraiser's valuation of mineral bearing land. "[I]n the appraisal of complex property consisting of different qualities of land and numerous improvements, all three [approaches] can be used simultaneously as cross-checks upon one another."[49]

---

(d) The sale must cover property which is comparable to the property being condemned.

[45] *Id.* The capitalization of income approach is also referred to as "discounted cash flow" or the "present worth of future income." It "relates earnings that reasonably could be expected to be derived from the property, discounted for risks and other variables, to arrive at a present value[.]" *Foster v. United States*, 2 Cl. Ct. at 447.

[46] 39 *The Professional Geologist* at 22.

[47] *Id.*

[48] *Id.* at 20.

[49] *W.Va. Dep't of Highways v. Sickles*, 161 W.Va. at 411, 242 S.E.2d at 569.

The existence and quantity of minerals on land taken through condemnation certainly bears on the fair market value of the real estate. Hence, we have recognized – when minerals are lying dormant under land taken through condemnation and are not being actively mined – that evidence of the separate value of those minerals may be "admissible to prove the market value of the land taken."[50] Accordingly, "an expert witness may testify to his opinion of the value *in place* of one unit of that [mineral] and multiply it by the quantity of that resource present in or on the land to determine the value of the element *in place*."[51] The expert's opinion must be based on the value of the mineral unmined and in place, and not as chattel being sold on the open market.

---

[50] *W.Va. Dep't of Highways v. Berwind Land Co.*, 167 W.Va. at 742, 280 S.E.2d at 618.

[51] Syllabus Point 1, *W.Va. Dep't of Highways v. Berwind Land Co.*, 167 W.Va. at 726, 280 S.E.2d at 609 (emphasis added). We noted, however, in Syllabus Point 2 of *Berwind Land* that there are limitations on the evidence that may be introduced about those minerals:

> The owner of fee property taken by eminent domain may prove the market value of the land by introducing evidence of the separate value of the elements present in or on the land when it can be shown that (1) the existence and quantity of the element of value can be accurately determined, (2) other factors, such as the expense of production and marketing, were taken into consideration in arriving at the value sought to be introduced, (3) the element is clearly significant in value, and (4) the use of the property for purposes of exploiting that element of value is not inconsistent or incompatible with the highest and best use to which the property may be put or that the subservient use has been devalued to the degree it interferes with the highest and best use of the property taken.

However, the fair market value of the condemned real estate as a whole may not be calculated by separately valuing the mineral interests and then adding these values to that of the surface.[52] When land underlain with minerals is taken by eminent domain, "the measure of compensation in such proceedings is the market value of the land to be condemned as a whole, with due consideration of all the components that make for its value."[53] As one manual on appraisal notes:

> Buildings and improvements, timber, crops, sand, gravel, minerals, oil, and so forth, in or upon the property are to be considered to the extent that they enhance the market value of the property as a whole. The total value of the property shall not be estimated by adding the values of such separate items to the value of the land . . . It must be remembered that it is the market value of the entire property that is the standard of valuation, and not the total of the money values of the separate items.[54]

Likewise, "[i]t is also important to remember that the activity of mineral extraction is a business activity and that the real property interests must be separated from those of a business."[55] Accordingly, when evidence is presented of separate values for minerals on

---

[52] *See United States v. 1,629.6 Acres of Land*, 360 F.Supp. 147, 151 (D. Del. 1973) ("The criticism most frequently cited against the simplistic price-tons approach is that it disregards market realities in that it assumes stable demand, competition, production costs, etc., and does not reflect the risks and uncertainties inherent in the operation of an enterprise.").

[53] Jean F. Rydstrom, "Valuation of mineral interests in federal condemnation proceedings," 40 A.L.R. Fed. 656 (1978).

[54] *Uniform Appraisal Standards for Federal Land Acquisitions* at 33.

[55] *The Appraisal of Real Estate* at 217.

25

the condemned land, "[t]he jury should be instructed that the evidence of separate values is only a factor to be considered in determining the total market value of the land[.]"[56] The just compensation to be awarded should be based on what a reasonable person would have relied upon when selling, buying, or valuing the property in a fair market.

"Evidence of value is largely a matter of opinion, and some speculation is inherent in the ascertainment of value of underground resources, such as minerals, oil, or gas."[57]

> The fact, however, that a valuation reached has in it baffling elements of speculation and surmise does not mean that it should not be employed. One guess may be better than another guess, since not all guesses have in them the same element of intelligence. The realization that a considerable amount of conjecture is involved should not paralyze the function of deciding, but it should induce humility. Dogmatism is clearly out of order in a modern valuation case.[58]

In this case, the DOH made a feeble attempt to establish the market value of Beacon's lease interest using the comparable sales approach (and utilized an expert opinion that, as we will discuss, was properly excluded). Beacon's appraisal expert

---

[56] Syllabus Point 2, in part, *W.Va. Dep't of Highways v. Berwind Land Co.*, 167 W.Va. at 727, 280 S.E.2d at 609.

[57] *Foster v. United States*, 2 Cl. Ct. at 446.

[58] *Cities Serv. Gas Co. v. United States*, 580 F.2d 433, 438 (Ct. Cl. 1978). *See also*, *Montana Ry. Co. v. Warren*, 137 U.S. 348, 352 (1890) ("Until there has been full exploiting of the vein its value is not certain, and there is an element of speculation, it must be conceded, in any estimate thereof. And yet, uncertain and speculative as it is, such 'prospect' has a market value[.]").

testified that he was using the capitalization of income approach. We will therefore explain the general application of these two approaches.[59]

In the valuation of mineral-bearing land, it is preferable that an appraiser first attempt to value the land based upon sales comparisons. The reason is obvious: the approach draws directly from sales data of comparable properties in the market.[60] "Data from completed transactions is considered a very reliable value indicator."[61] It is also "the most easily understood approach to value[.]"[62] "Arm's length transactions in lands in the vicinity of and comparable to the land under appraisement, reasonably near the time of acquisition, are the best evidence of market value, but not to the extent of exclusion of other relevant evidence of value."[63]

For an appraiser to properly evaluate what are perceived to be comparable sales, the appraiser "should personally verify sales with either the buyer or seller. . . . Verification of a sale with the broker or attorney and the buyer or seller will usually

---

[59] "The cost approach is generally not applicable to mineral properties because it involves estimating the cost to reconstruct a similar property." Rebekah King, *Valuation of Minerals in Takings Cases*, 42 Nat. Resources J. 185, 191 (2002).

[60] 39 *The Professional Geologist* at 20 ("The author promotes the view that one should always attempt to use the sales comparison approach in a valuation [of mineral-bearing properties].")

[61] *The Appraisal of Real Estate* at 382.

[62] *Uniform Appraisal Standards for Federal Land Acquisitions* at 38.

[63] *Id.* at 37. *See also*, *United States v. New River Collieries*, 262 U.S. 341, 344 (1923) ("Where private property is taken for public use, and there is a market price prevailing at the time and place of the taking, that price is just compensation.").

produce the greatest amount of useful, reliable information."[64]   "Appraisers must thoroughly research the prices, real property rights conveyed, financing terms, motivations of buyers and sellers . . . and dates (i.e., the market conditions) of the property transactions."[65]   In collecting this information, "appraisers will rely heavily on interviews, personal contacts, and proprietary research.  Personal verification with a party to the transaction is an important step in the sales comparison approach."[66]

In the instant case, the DOH offered evidence of "comparable" sales through an expert witness, Mr. Gray.  As we discuss below, the circuit court acted within its discretion when it excluded Mr. Gray's opinion of comparable sales because his opinion relied solely upon press releases and news articles found on the internet.  We find further support for the circuit court's decision in the fact that Mr. Gray did not investigate to determine if the comparable sales were arm's-length transactions.  The DOH also offered no evidence to show Mr. Gray's supposed comparable sales were in the vicinity of or in any way comparable to the Tucker County property at issue.  One of Mr. Gray's proposed comparable sales was in Australia and another was in Indonesia.  Additionally, Mr. Gray did nothing to personally verify his comparable sales with either the buyer or seller, and did no research about the true prices of the properties, the terms of any

---

[64] *Wright v. Banks*, 232 W.Va. 602, 606, 753 S.E.2d 100, 104 (2013) (*quoting* J.D. Eaton, *Real Estate Valuation in Litigation* 202 (2nd Ed. 1995)).

[65] *The Appraisal of Real Estate* at 382.

[66] *Id.*

financing, what property rights were conveyed, the motivations of the parties, or the market conditions surrounding the sales.

While courts generally favor the sales comparison approach when valuing real estate, "there are, of course, some income-producing properties for which the income capitalization approach is particularly relevant."[67]  The value of minerals under land (such as coal, oil, gas, limestone, sand, gravel, or clay) to the owner or lessee of mineral rights usually lies not in their value in the ground, but in the future income to be gained by their eventual extraction and sale.  Experts estimating the value of mineral-producing land (like in this case) are, therefore, often tempted to skip the sales comparison approach and jump straight to the income capitalization approach:

> While it is recognized that each property containing valuable mineral deposits is unique, the same may be said, to some degree, of all real estate.  However, "[e]lements of sales of quite distant properties, even those with different mineral content, may be comparable in an economic or market sense when due allowance is made for variables."  Therefore, it is unacceptable for an appraiser preparing an appraisal . . . to simply state that there are no comparable sales transactions without providing adequate support for the conclusion.[68]

An appraiser must be able to articulate why a fair market value could not be calculated under the sales comparison approach or the cost approach (if applicable) before relying solely upon the income capitalization approach.

---

[67] *Uniform Appraisal Standards for Federal Land Acquisitions* at 42.

[68] *Id.* at 96-97 (footnotes omitted).

The income capitalization approach is complex and employs specialized terminology, but is "intend[ed] to simulate investor behavior."[69] The approach blends current cash flows and estimates of future income and expenses, so as to develop a "reliable estimate of income expectancy"[70] that a buyer and seller would rely upon in a sale of the real estate. At its heart, the income capitalization approach revolves around the appraiser's calculation of the "net operating income" from the real estate, which is roughly the income remaining after deduction of certain operating expenses (but not all expenses).[71] The income approach incorporates the possibility that real estate may sometimes have expenses that exceed income, yet over time have a positive income stream that would make the property a worthy investment.[72]

---

[69] *The Appraisal of Real Estate* at 442. To be clear, however, investor behavior can be motivated by considerations that do not result in a fair market value. "A particular investor may be willing to pay a price different from market value, if necessary, to acquire a property that satisfies other investment objectives unique to that investor." *Id.* at 444. An appraiser must therefore take care to ensure that fair market valuations under the income capitalization approach are based on a typical investor.

[70] *The Appraisal of Real Estate* at 463.

[71] "Net operating income . . . is the actual or anticipated net income remaining after all operating expenses are deducted from effective gross income. Net operating income is customarily expressed as an annual amount." *The Appraisal of Real Estate* at 451-52. "This definition mirrors the convention used in corporate finance and business valuation for EBITDA (earnings before interest, taxes, depreciation, and amortization)." *Id.* at 452.

[72] *See, e.g., Cliff v. Dep't of Revenue*, 8 Or.Tax. 250 (1980) (although farm property was valued for taxation using income approach, taxpayer noted that "expenses for the property would exceed the gross income estimated" when he hired a man "as a general operator, cat skinner and maintenance man," and hired another man to maintain the fences, in addition to routine costs of fertilizer and seed); *Regents Park Partners v.*

(continued . . .)

The income approach supports two different methods of capitalization to reach a fair market value: direct capitalization and yield capitalization. Direct capitalization essentially converts a single year's "net operating income into an indication of overall property value" by multiplying the net income by a capitalization rate that accounts for characteristics of the real estate.[73] Yield capitalization requires the appraiser to forecast the future income stream of the real estate which is then "discounted in order to obtain a 'present value' as of the date of taking."[74] Overall, the income approach converts the income that the real estate is expected to generate into a factor that a reasonable buyer or seller would consider in determining fair market value.

Utilized properly, the income capitalization approach "accounts for and reflects those items and forces that affect the revenue, expenses, and ultimate earning capacity of real estate and represents a forecast of events that would be considered likely within a specific market."[75] "Both direct capitalization and yield capitalization are market-derived techniques, and when applied correctly they should result in similar value

---

*Comm'r of Internal Revenue.*, 63 T.C.M. (CCH) 3131 (T.C. 1992) (income approach used to value apartment complex; although rental income was not enough for repayment of mortgages, income did exceed other expenses).

[73] *The Appraisal of Real Estate* at 456, 461.

[74] *Foster v. United States*, 2 Cl. Ct. at 455. "The financial and economic concepts implicit in a discount rate are complex and have been the subject of significant analysis for more than a century." *The Appraisal of Real Estate* at 458.

[75] Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice*, "Statement on Appraisal Standards No. 2," p. U-72 (2014-2015 Edition).

indications for the subject property. . . . If differences arise, the appraiser should check that the various techniques are being applied correctly and consistently[.]"[76]  And, as noted earlier, if the sales comparison approach can be used to calculate a fair market value for a tract of real estate, then that valuation should be similar to a fair market value of the same tract calculated using the income capitalization approach.

"In applying the income capitalization approach, appraisers must take care to consider only the income that the property *itself* will produce – not income produced from the business enterprise conducted on the property (i.e., the business of mining)."[77] In considering expert testimony based on income capitalization, the finder of fact "must draw a distinction between the capitalization of income generated by the property itself

---

[76] *The Appraisal of Real Estate* at 461-62.

[77] *Uniform Appraisal Standards for Federal Land Acquisitions* at 97 (emphasis added).  Another commentator offered the following example of why a business operated upon real estate cannot be considered in determining market value:

> This is true in the case of mineral properties where a company may be able to enhance the value of a particular property through certain expertise unique to that company.  An example of this situation could be where an oil company owns wells and also owns transportation, processing and refining facilities near these wells. This company will probably be able to reap higher profits off production from the area due to the integration of operations than a company just producing wells. In this instance, if the integrated company's wells are condemned, it will not be able to claim higher market value due to its unique position.

Douglas S. Widlund, *Evaluating Minerals In Condemnation Cases*, 40C Rocky Mtn.Min.L. Spec. Inst. 2 (1996).

and income derived from a business conducted on the property."[78]  In the absence of care, "such valuations can reach wonderland proportions."[79]

In this case, Beacon offered the expert opinion of an appraiser, Douglas C. Wise, to value its lease interest.  Mr. Wise, with no explanation, said that he "could not properly process" the cost approach and the sales comparison approach in valuing the lease, and so he relied solely upon the income capitalization approach.

We cannot discern from the trial record whether Mr. Wise used a direct capitalization method, a yield capitalization method, or whether he used either method correctly.  Counsel for Beacon asked few questions during Mr. Wise's direct examination, and he was repeatedly permitted to give drawn-out narrative answers.  The trial transcript does little to allow us to understand his calculations.

As best we can determine from the record, here is how Mr. Wise applied the income capitalization approach:[80] first, the DOH projected that there were 1,617,462

---

[78] *Cloverport Sand & Gravel Co. v. United States*, 6 Cl. Ct. at 191.  *See also*, 7A *Nichols on Eminent Domain* at § G9A.04[1][d] ("[T]he income approach to value should not confuse real estate income, such as rental income, with income derived from the operation of a business on the real estate.").

[79] *United States v. 47.14 Acres of Land*, 674 F.2d 722, 726 (8th Cir. 1982) ("It is necessary to take into consideration manifold and varied factors, like future supply and demand, economic conditions, estimates of mineral recoverability, the value of currency, changes in the marketplace, and technological advances.  Many of these factors are impossible to predict with reasonable accuracy.").

[80] This Court makes no judgment as to the validity or reliability of Mr. Wise's expert opinion.  Cross-examination by counsel for the DOH did little to shed light on the quality of Mr. Wise's opinion.

tons of coal underlying the 187 acres. Mr. Wise opined that 80% of that coal would be recoverable and saleable. Mr. Wise also claimed (like Beacon's owner, Mr. Svonavec) that all of the coal would be sold for $120.00 per ton; after production costs he said the coal would garner $64.80 in "gross profit to the leaseholder."[81] He then carved off a 14% "entrepreneurial adjustment"[82] as profit that a fair market purchaser would expect to receive. He further opined that Beacon would take eight years to remove all of the coal. Finally, spreading Beacon's profits over an eight year period, Mr. Wise reduced those

---

[81] We are unclear if this technique was correct, particularly if Mr. Wise was utilizing the yield capitalization approach. The yield capitalization method requires the expert to forecast the future income stream of the real estate by making a "comprehensive study of historical income and expenses for the subject property," and then using a "reconstructed operating statement" with "explicit forecasts of income, expenses, and changes in [income] and expenses over the projection period." *The Appraisal of Real Estate* at 460-61. Mr. Wise seems to have based his opinion purely on Mr. Svonavec's testimony of net profits, rather than Beacon's actual historical income and expenses.

[82] "Entrepreneurial incentive" is factored into fair market value as a recognition that

> [n]o prudent developer will undertake to construct and market a property without anticipating receipt of a profit in addition to the return of the equity investment. The purchaser who continues an existing land use is not creating value, only maintaining value through proper management of the property. A developer, on the other hand, invests not only equity in a development but also time and expertise. Accordingly, an entrepreneur expects a reward – known as *entrepreneurial incentive* . . . [E]ntrepreneurial incentive is a forecast of the amount the developer expects to receive.

*The Appraisal of Real Estate* at 23-24.

future profits to present value using a 10% discount rate. Mr. Wise therefore concluded that Beacon's 187-acre leasehold interest was worth about $48 million.

The jury rejected the DOH's and Beacon's proposed valuations and set just compensation at $24 million for both the land taken and the damages to the residue.

## C. *A New Trial is Required by this Record*

From our discussion above, we discern two legal principles for condemnation proceedings that guide our ruling today.

First, in a condemnation action, the amount of raw profit lost from a business operated either on the condemned real estate or on its residue may not be the sole basis to establish just compensation. Stated another way, business profits lost as a result of a condemnation action may not be recovered as an independent element of damages.

Second, in a condemnation action, under the income capitalization approach to appraisal, an expert witness's assessment of the income stream that real property produces may be relied upon to support a fair market valuation of an interest in real estate. Generally, the income capitalization approach weighs the anticipated income stream from the real estate as an element of fair market value, as of the date of taking, and accounts for likely forces and events in the market that would affect the revenue, expenses, and net operating income of the real estate interest.

We recognize that these two legal principles seem to be at odds with one another; they are not. The former rule excludes loss of profits or other consequential

35

damages to a business from the computation of just compensation. Lost profits are not recoverable as a separate component of market value in a condemnation action. The latter rule, however, considers that profits may be germane in a condemnation action to the extent they exert an effect on the fair market value of the real estate. Essentially, the principles reflect the distinction "between income as a *criterion* of value and income as *evidence* of value. While net income . . . is not controlling on the issue of value, evidence thereof may be considered by the jury in conjunction with all other material evidence."[83] As one court said,

> The truth is the amount of actual net revenue does not determine the value of land in every case. The revenue would vary according to the industry, skill, and wisdom of the person cultivating the land. . . . But other elements, such as the state of the market, the demand and supply of land of the character in question, the prospects of advance, and perhaps other things, would ordinarily affect the question of value and fix it at a sum different from that produced by capitalization of net revenue. The actual market value is the thing to be determined, and while net revenue should be considered, it does not, in general, furnish a conclusive measure of such market value.[84]

For instance, say the DOH builds a highway and, through condemnation, takes one of two entrances onto the lot for a gas station. Thereafter, the gas station's profits drop by $500 per day because fewer customers enter the property. The owner may not seek just compensation for the lost $500 per day. The day-to-day fortunes of the

---

[83] 5 *Nichols on Eminent Domain* at § 19.01.

[84] *De Freitas v. Town of Suisun*, 170 Cal. 263, 266, 149 P. 553, 555 (1915).

gas station business are simply too reliant upon economic conditions, the skill of the owner, the whims of customers, the acts of employees, etc. The shift in daily profits is therefore too speculative a number upon which to base damages. Using the income capitalization approach, however, the owner may show that the fair market value of the lot has decreased, in part, because the DOH's condemnation action reduced the future income stream that would be generated by the real estate.[85]

The parties in this case have not asked us to alter our long-standing rule and thereby hold that lost profits, loss of goodwill, going concern value, or other consequential damages to a business caused by the exercise of eminent domain are elements of just compensation. We note, however, that several state legislatures have required the inclusion of those damages in awards of just compensation.[86]

---

[85] *See*, *e.g.*, *Dep't of Transp. v. Shell Oil Co.*, 156 Ill. App. 3d 304, 308, 509 N.E.2d 596, 599-600 (1987) (Government took 741 square feet of 24,500 square foot lot used by service station; sales of gasoline thereafter dropped from 55,000 gallons each month to 34,000 gallons after taking. Expert could testify that, using market sales of comparable service stations, the reduced sales decreased value of remainder by $88,000.).

[86] *See*, *e.g.*, Cal. Civ. Proc. Code § 1263.510 (requiring the "owner of a business conducted on the property taken, or on the remainder if the property is part of a larger parcel, shall be compensated for loss of goodwill" if the owner provides certain proof); Wyo. Stat. Ann. § 1-26-713 (same); Fla. Stat. § 73.071(3)(b) ("Where less than the entire property is sought to be appropriated, any damages to the remainder caused by the taking, including . . . the effect of the taking of the property involved may damage or destroy an established business . . . the probable damages to such business which the denial of the use of the property so taken may reasonably cause[.]"); Va. Code Ann. § 25.1-230.1 ("just compensation shall include . . . lost profits to the owner of a business or farm operation conducted on the property"); Vt. Stat. Ann. tit. 19, § 501 ("Damages resulting from the taking or use of property . . . shall be the value. . . of the business on the property, and the direct and proximate decrease in the value of . . . the business on the property.").

In this case, the owner of Beacon, Mr. Svonavec, gave his opinion that a fair market value for Beacon's lease was $84 million, based solely upon his opinion of the future profits of his business. "Our law has long recognized the admissibility of a landowner's opinion concerning the value of his land."[87] This is allowed because "it is generally understood that the opinion of the owner is so far affected by bias that it amounts to little more than a definite statement of the maximum figure of his contention."[88] However, the "authorization for a landowner to testify is not merely the

---

[87] *W.Va. Dept. of Highways v. Sickles*, 161 W.Va. at 411, 242 S.E.2d. at 570. *See also*, *Virginian Power Co. v. Brotherton*, 90 W.Va. 155, 110 S.E. 546 (1922) (In a proceeding to condemn land, "if a witness have some personal knowledge of the land to be taken, its location, fertility, and adaptability to agriculture, etc., he may give his opinion, its weight and credibility being a question for the jury."); Syllabus Point 2, *Clay Cnty. Ct. v. Adams*, 109 W.Va. 421, 155 S.E. 174, 174 (1930) ("It is not reversible error in a condemnation proceeding to permit the defendant to give his opinion as to amount of damages he has sustained by reason of the taking, where he has given facts on which his opinion is based, and where he has been fully cross-examined as to such facts."); Syllabus Point 1, *Tennessee Gas Transmission Co. v. Fox*, 134 W.Va. 106, 58 S.E.2d 584 (1950) ("A witness . . . who is acquainted with the land involved . . . is sufficiently qualified to give his opinion of its market value."); *Toppins v. Oshel*, 141 W.Va. 152, 167, 89 S.E.2d 359, 368 (1955) ("A witness who is acquainted with the location and the character of land and its adaptability to particular purposes may give his opinion as to its value and, though not an expert and not regarded as such, his evidence relative to value is competent and its weight and its credibility are for the jury."); *W.Va. Dep't of Highways v. Fisher*, 170 W.Va. 7, 8, 289 S.E.2d 213, 215 (1982) ("in condemnation proceedings, a landowner may express his opinion concerning the value of his land"); *Smithson v. U.S. Fid. & Guar. Co.*, 186 W.Va. 195, 204, 411 S.E.2d 850, 859 (1991) ("we have allowed the owner of property, both real and personal, to express an opinion on its value. This was based on the assumption that an owner has some knowledge of his property's worth.").

[88] *N.C. State Highway Comm'n v. Helderman*, 285 N.C. 645, 652, 207 S.E.2d 720, 725 (1974).

---

granting of permission to the litigants to act out" and "testify to grossly inflated values."[89] Put simply, a property owner may not base his opinion solely upon lost business profits because it "suggests to the jury that the property owner is entitled to those losses."[90]

Mr. Svonavec's valuation was solely based on the "profit margin on that coal" and the "profit per ton," and the raw business profits he stood to lose. Beacon's expert appraiser confirmed this valuation was based on the "gross profit to the leaseholder." The methodology by which Mr. Svonavec arrived at his opinion centered exclusively upon the future profits lost by Beacon. The circuit court was therefore plainly wrong in holding that "[n]o specific evidence was presented regarding the business profits" of Beacon.

The DOH proposed an instruction providing that the jury "may not consider any lost profit or damage or injury to any businesses," "because such damages depend on contingencies too uncertain and speculative to be allowed." The instruction is certainly not a model of artful drafting. However, had the instruction been incorporated into the circuit court's instructions defining just compensation, it would have alerted the jury that it could not award damages based upon Beacon's lost profits alone. It is our judgment that the circuit court erred as a matter of law in refusing to instruct the jury to disregard any evidence of business profits when weighing just compensation.

---

[89] *W.Va. Dept. of Highways v. Sickles*, 161 W.Va. at 412, 242 S.E.2d at 570.

[90] *Dep't of Transp. v. M.M. Fowler, Inc.*, 361 N.C. 1, 12, 637 S.E.2d 885, 894 (2006).

Additionally, Mr. Svonavec suggested a fair market value of Beacon's lease by simply multiplying the estimated quantity of coal by his claimed net profit. This method of calculating just compensation has been universally disapproved. "Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts," largely because "[n]o man of business experience would buy property on that theory of value."[91]

To the credit of the inherent intelligence and common sense of the jurors, the jury did not accept at face value Beacon's demand for just compensation based upon its pure business profits. Beacon did, later, attempt to offer an expert's opinion of fair market value based on the income capitalization approach, although we cannot discern if that opinion correctly applied the income approach or, in fact, improperly relied solely upon Beacon's business profits. In summary, it is impossible for us to tell the extent to which the jury did consider the incompetent testimony of business profits. What is clear is that the DOH was entitled to an instruction that the jury was not to consider evidence of Beacon's lost business profits.

D. *Testimony of Comparable Sales*

The DOH's second argument on appeal is that the circuit court erred in excluding expert testimony from Thomas Gray concerning sales of comparable mining properties. "The admissibility of testimony by an expert witness is a matter within the

---

[91] *United States v. Sowards*, 370 F.2d at 90-91.

sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong."[92] We have reviewed the circuit court's decision for an abuse of discretion, but find none.

The West Virginia Rules of Evidence are "the paramount authority for determining whether an expert is qualified to give an opinion on the value of real estate in an eminent domain proceeding."[93] Under Rule 703, an expert is permitted

> to base his opinion on (1) personal observations; (2) facts or data, admissible in evidence, and presented to the expert at or before trial; and (3) *information otherwise inadmissible in evidence, if this type of information is reasonably relied upon by experts in the witness' field.*[94]

Further, under Rule 702 "an expert's opinion is admissible if the basic methodology employed by the expert in arriving at his opinion is scientifically or technically valid and properly applied."[95]

In the instant case, Mr. Gray intended to offer testimony ostensibly of comparable sales. However, knowledge of these sales was gleaned from newspaper articles and press releases found through a search of the internet. One sale was of a

---

[92] Syllabus Point 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991). Accord, Syllabus Point 1, *Watson v. Inco Alloys Intern., Inc.*, 209 W.Va. 234, 545 S.E.2d 294 (2001).

[93] *W.Va. Div. of Highways v. Butler*, 205 W.Va. 146, 151, 516 S.E.2d 769, 774 (1999).

[94] Syllabus Point 2, *Mayhorn v. Logan Med. Found.*, 193 W.Va. 42, 454 S.E.2d 87 (1994) (emphasis added).

[95] Syllabus Point 4, *id.*

property containing coal reserves in Indonesia, another of coal reserves in Australia. Some of these so-called comparable sales were not for cash but for stock. In his deposition, Mr. Gray showed no knowledge of the quality of the coal, such as its thickness, sulfur content, or amount of overburden. In essence, Mr. Gray failed to follow the basic methodology employed by an expert in the field of property appraisals, and based his opinion on information that had no established relevance or reliability. "[T]he question of the admissibility of particular comparable sales rests within the sound discretion of the trial judge,"[96] and "if the elements considered by the witness in reaching his opinion are irrelevant, speculative and conjectural, or otherwise incompetent, the opinion should be excluded."[97]

On this record, we find no error in the circuit court's decision to bar Mr. Gray's opinion concerning comparable sales.

E. *Trial Considerations on Remand*

We note that this trial, despite the yeoman's job of the trial judge, was an appalling train wreck. The circuit court did a commendable job with little assistance by counsel for the parties, particularly the DOH. Considering that trial counsel for the DOH

---

[96] *W.Va. Dep't of Highways v. Brumfield*, 170 W.Va. at 679 n. 2, 295 S.E.2d at 920 n. 2.

[97] *W.Va. Dep't of Highways v. Bellomy*, 169 W.Va. 791, 793, 289 S.E.2d 511, 512 (1982).

was tasked with protecting millions of dollars in the public fisc, we are shocked at counsel's seeming lack of preparation or participation in the trial.[98]

For instance, trial counsel for the DOH sought to introduce evidence of the price Beacon paid for its leasehold interest in 2011. "[T]he purchase price paid for property [being condemned] in a recent arm's length transaction is a substantial factor in determining the property's true and actual value."[99] A prior, recent sale of the condemned real estate itself, in an open, voluntary and arm's-length market transaction, is generally the most comparable of all comparable sales for assessing a fair market value. However, the circuit court excluded this evidence. It was not raised as an error on appeal because counsel for the DOH failed to make, or was incapable of making, a record suggesting it was a mistake.

The poorly-made record suggests that, barely a year before the condemnation proceedings were filed, Beacon (and its coal lease) was sold to Mr. Svonavec for $350,000 up front, plus a royalty of $3.00 per ton of coal sold. It was within the sound discretion of the circuit court as to whether to admit evidence of the sale price paid by Beacon,[100] but the DOH was first required to provide the following proof: "(a) The sale must be bona fide; (b) The sale must be voluntary, not forced; (c) The sale

---

[98] We wish to stress, in light of the poor performance of the DOH's trial counsel, that the DOH is represented by different counsel on appeal.

[99] *Wright v. Banks*, 232 W.Va. at 605, 753 S.E.2d at 103.

[100] Syllabus Point 4, *W.Va. Div. of Highways v. Butler*, 205 W.Va. at 146, 516 S.E.2d at 769.

43

must have occurred relevantly in point of time; and (d) The sale must cover substantially the same property which is the subject of the appropriation action."[101]

Sadly, at trial, counsel for the DOH had no facts to show the purchase of Beacon and its leasehold in 2011 was, in any way, a bona fide or arm's-length transaction. Counsel for the DOH was unsure if Mr. Svonavec and the seller were now joint owners of Beacon, and was unaware of any of the terms of the sale. Further, counsel for the DOH had no idea if the seller was having financial problems at the time of the conveyance, and so had nothing to indicate whether the sale was forced or voluntary. Most appallingly, counsel made no attempt to vouch the record to offer any of this evidence to the circuit judge. Our understanding of the 2011 sale comes largely from comments muttered off-handedly in a sidebar conference.

Furthermore, many times the trial attorneys showed little knowledge of condemnation law. For example, at times counsel for Beacon asserted to the jury they were "seeking recovery for a coal mine" because there was an active mine on the property at the time of the take, and at other times said Beacon was "seeking recovery for a lease." No one – particularly counsel for the DOH, who we would presume to be the most knowledgeable on this topic – ever pointed out to the judge or jury that condemnation law is designed to award just compensation for interests in real estate (interests like a leasehold), not interests in businesses using the real estate.

---

[101] Syllabus Point 5, *id.*

44

Another illustration can be found in a jury instruction proffered by the DOH and given by the trial judge. The instruction told the jury that the damage to the residue of the real estate should be valued as the difference between the market value immediately before and immediately after the taking, "less any *special benefits* which you may feel have [accrued] to the residue by reason of the construction of the road." (Emphasis added). This instruction reflects the ancient rule that "peculiar or special benefits" to the residue from the public improvement were to be deducted from the damage award, while "general benefits" common to the community were not.

The problem with the damage instruction is this: in 1933, the Legislature abolished any distinction between "peculiar or special benefits" and "general benefits" in condemnation actions.[102] This Court discussed that statutory change in the seminal 1947 case of *Strouds Creek & Muddelty Railroad Co. v. Herold*, where we ruled that the measure of damages to the residue "is the difference in its market value immediately before and immediately after construction . . . *beyond all benefits* to the property arising from such construction."[103] We reiterated our holding in 1973, stating that damages to the residue must account for "*all benefits* which may accrue to the residue from the

---

[102] *See* 1933 *Acts of the Legislature* c. 28. The modern iteration of the statute, *W.Va. Code* § 54-2-9 [1963], defines just compensation for the residue as the damages that are "beyond all benefits which will be derived in respect to such residue from the work to be constructed[.]"

[103] *Strouds Creek & M. R. Co. v. Herold*, 131 W.Va. 45, 53, 45 S.E.2d 513, 519 (1947) (emphasis added), *overruled on other grounds by West Virginia Dept. of Highways v. Berwind Land Co.*, 167 W.Va. 726, 280 S.E.2d 609 (1981).

construction of the improvement for which the land was taken."[104] Yet, at trial, none of the lawyers pointed out that the DOH's instruction incorrectly discussed "special benefits." Judges are not legal encyclopedias. The lawyers must help the trial judge by submitting correct legal arguments, particularly in complex and specialized litigation.

Another example can be found in the opinion testimony concerning the alleged damage to the 157-acre residue. The jury was required to award just compensation for the difference in fair market value of the residue immediately before and immediately after the taking. Yet no lawyer – for Beacon, Western Pocahontas, or the DOH – asked any witness the three simple questions that arise from this test: What was the value of the residue immediately before the taking? What was the value immediately after? And what was that difference? Instead, witnesses lobbed a bewildering array of numbers to the jury without context.

Yet another example can be found when counsel for Western Pocahontas (the fee simple owner of both the surface and the underlying coal reserves) announced his client was satisfied with $750,000 for the surface of the land. Counsel for Western Pocahontas then asked to be dismissed from the trial because it was only "the coal that is at issue," and counsel for the DOH said he was "fine with them leaving." Further, counsel for Western Pocahontas represented that the $5,863,100 deposited by DOH in July 2012 belonged solely to Western Pocahontas, and that whatever verdict was returned

---

[104] Syllabus Point 3, *W.Va. Dep't of Highways v. Bartlett*, 156 W.Va. at 432, 194 S.E.2d at 384 (emphasis added).

by the jury would belong exclusively to Beacon. The ever-wary circuit court, adrift in the bad advice of the trial attorneys, required counsel for Western Pocahontas to remain in the trial.

The problem with these waffling assertions by the trial attorneys is that they had little basis in law. First, when a government entity exercises the power of eminent domain to acquire a fee simple title to a tract of real estate, every party who has an interest in that tract must be a party to the condemnation proceeding.[105] The right to just compensation must be adjudicated for all parties who have interests in the condemned real estate, from the stars to the center of the earth, in one proceeding, at the same time.[106] "[W]here the mineral interest and the surface interest are owned by different persons, the mineral interest may be valued separately, but it must be valued as a segregated part of real property and not as a natural warehouse for minerals as personal property"[107]

Furthermore, in a condemnation trial involving real estate that is leased, West Virginia Code § 54-2-10 indicates that the primary party in interest is the owner and

---

[105] Syllabus Point 1, *State by Dep't of Natural Res. v. Cooper*, 152 W.Va. at 309, 162 S.E.2d at 281 ("Where the State of West Virginia, or any entity with statutory authority to take property for public use, undertakes to acquire the fee simple title to a parcel of land all persons who own an interest or an estate in such parcel must be joined as party defendants in the proceeding.").

[106] Syllabus Point 3, *id.* ("Where an entity authorized by law to take property for public use seeks to acquire a fee simple title to a parcel of land, it is entitled to an assessment of all damages arising from such taking in a single proceeding, and, to accomplish this purpose, all persons who own an interest or estate in such parcel of land are necessary parties to the proceeding.").

[107] *Id.,* 152 W.Va. at 315-16, 162 S.E.2d at 285.

47

lessor of the condemned real estate, not the tenant.  The jury is tasked with determining the just compensation payable to the owner/lessor for the real estate taken and for damages to the residue, and the owner/lessor is then tasked with paying the tenant just compensation for the value of the leasehold interest.  While the jury may hear evidence of the leasehold's value, and by interrogatory determine its value, just compensation is awarded to the owner of the real estate.  The owner then pays the tenant the tenant's share of the compensation.  The statute provides, in pertinent part, that "the value of any leasehold on the property proposed to be taken, that must be paid by the owner thereof to his tenant or tenants, shall be admissible in evidence . . . in the trial by jury."[108]

In its order denying a new trial, the circuit court expressed surprise at the quality of the advocacy of the DOH's trial counsel.  For instance, given the "unusual posture of the take in this case," the circuit court said it was "quite frankly surprised that the [counsel for the DOH] did not submit special interrogatories," leaving the court and parties with no understanding of the deliberations, decision or rationale of the jury in its damage award.  We are sufficiently troubled by the quality of the trial record that we have considered – but declined – exercising our discretion to review what can only be considered "plain errors" not raised by the DOH in its appeal.  *See W.Va. Rules of Appellate Procedure* Rule 10(c)(3).  We anticipate that, on remand, inadequacies such as these will be remedied by trial counsel for the parties.

---

[108] *W.Va. Code* § 54-2-10 [1967].

**IV.**
**CONCLUSION**

The circuit court erred when it failed to give the DOH's proposed instruction informing the jury to disregard Beacon's profits when assessing just compensation. We therefore reverse the circuit court's February 4, 2014, orders entering judgment and denying a new trial, and remand the case for a new trial.

Reversed and Remanded.