IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 18-0210

_____

FILED

**April 12, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

ANDREA M. SIMMONS, Executor of the
Estate of Roger G. Fussell,
Petitioner Below, Petitioner

v.

JOANN FUSSELL,
Respondent Below, Respondent

_____

Appeal from the Circuit Court of Randolph County
The Honorable David H. Wilmoth, Judge
Civil Action No. 17-C-64

AFFIRMED

_____

Submitted: March 13, 2019
Filed: April 12, 2019

John J. Wallace, IV, Esq.                    Harry A. Smith, III, Esq.
Joseph A. Wallace, Esq.                      Jory & Smith, L.C.
Wallace Law Offices, L.C. Inc.               Elkins, West Virginia
Elkins, West Virginia                        Counsel for the Respondent
Counsel for the Petitioner

JUSTICE ARMSTEAD delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "'In reviewing challenges to the findings and conclusions [found by a special commissioner that were adopted by the circuit court], a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a de novo review.' Syllabus Point 1, *Public Citizen, Inc. v. First National Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538 (1996). Syllabus Point 1, *Napier v. Compton*, 210 W.Va. 594, 558 S.E.2d 593 (2001)." Syllabus Point 1, *Dodd v. Potomac Riverside Farm, Inc.*, 222 W. Va. 299, 664 S.E.2d 184 (2008).

2.      "'The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.' Syllabus Point 6, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991)." Syllabus Point 4, *W. Va. Dep't of Transp., Div. of Highways v. W. Pocahontas Props., L.P.*, 236 W. Va. 50, 777 S.E.2d 619 (2015).

3.      "If a person make an oral promise to pay the debt of another in order to derive some benefit to himself thereby, which he did not otherwise have, such promise is an original undertaking and not within the statute of frauds; and in such case it matters not if the original promisor be not released." Syllabus Point 2, *Howell v. Harvey*, 65 W. Va. 310, 314, 64 S.E. 249, 251 (1909).

i

4.	"An oral promise to pay the debt of another, when supported by a new consideration beneficial to the promisor, is not within the statute of frauds." Syllabus Point 1, *Mankin v. Jones*, 68 W. Va. 422, 69 S.E. 981 (1910).

5.	"A collateral oral promise by one to pay another's debt is not binding where no benefit accrues to the person making such promise." Syllabus Point 5, *Mankin v. Jones*, 63 W. Va. 373, 60 S.E. 248 (1908).

Armstead, Justice:

Petitioner, as Executor of the Estate of Roger G. Fussell, appeals the February 7, 2018, order of the Circuit Court of Randolph County that affirmed an order of the Randolph County Commission, which, in turn, affirmed the findings of its special fiduciary commissioner. The special fiduciary commissioner found that: (1) two bank notes, obtained by Respondent Joann Fussell (hereinafter, "Joann"), were just debts of the estate; (2) Joann was not a creditor beneficiary of a life insurance policy on the life of Roger G. Fussell (hereinafter, "Roger"); and, (3) written appraisals of certain assets located in West Virginia and Georgia were appropriate considerations to establish fair market value.

We have reviewed the record before us, heard the oral arguments of the parties, and reviewed the pertinent legal authorities. For the reasons stated below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 20, 2000, Joann married Roger, and the Fussells lived together as husband and wife for the first six years of their marriage. Though never divorced, they were estranged the last three years of their marriage and lived separately and apart for those years. Even though they were estranged at the time of Roger's death, his Will, executed on November 5, 2009, a mere six weeks prior to his December 21, 2009, death, provided for his wife:

> SECOND: If I am married to Joann M. Fussell at the time of my death, I wish for her to have her statutory share as provided by the laws of the State of West Virginia recognizing that we have lived separate and apart for the last several years preceding the date of this instrument.

1

Long before that, on January 23, 2001, Joann obtained a loan from Freedom Bank,[1] solely in her name, in the original principal amount of $40,010.[2] The next day, January 24, 2001, a check in the amount of $40,000 was written by Joann to Freedom Bank. Freedom Bank then wrote a cashier's check in the same amount to Roger. Joann's loan with Freedom bank was subject to allonges,[3] which had the cumulative effect of adding an additional $16,505.99 to the loan. From those proceeds, a cashier's check from Freedom Bank in the amount of $15,844.21 was paid to the Sheriff of Randolph County to redeem property taxes on a parcel of land owned by Roger, and a separate cashier's check in the amount of $37.00 was paid to the Clerk of the Randolph County Commission for the redemption fees on that parcel. The balance of the monies generated by the allonges were paid to Roger.

On December 30, 2008, Joann obtained a second loan, from BC Bank, solely in her name, in the original principal amount of $50,000. The check from BC Bank to Joann for those loan proceeds was endorsed on the back, "s/Joann M. Fussell, pay to the order of Roger G. Fussell, s/Roger Fussell."

---

[1] According to the parties, the original loan was obtained from Belington Bank. That entity changed its name to Freedom Bank in June 2004. For ease of understanding, this entity is referred to as Freedom Bank throughout this opinion.

[2] Ten dollars was for a flood certification fee.

[3] "[A]llonge (a-lawnzh) [French allonger "to lengthen"] (1859) . . . A slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." *Allonge*, *Black's Law Dictionary* (10th ed. 2014).

Importantly, the entire proceeds of both bank loans taken solely in Joann's name, were loaned by Joann to Roger. Joann testified that this arrangement was necessary for Roger to obtain loans, because he was unable to obtain bank loans in his own name. It is undisputed that Joann did not use any of the proceeds of the loans she obtained from the banks. She promptly loaned those proceeds to Roger. Until just prior to his death, it is also undisputed that checks drawn on accounts on which Roger was a signatory[4] were written and made all payments directly to both banks. In October 2009, Joann started making payments on both loans to the banks as Roger began to succumb to his final illness. Joann alleges that she had an oral contract, which provided that in exchange for her loaning all of the bank loan proceeds to Roger, he would repay her by making her payments directly to the banks.

Prior to his death, and unknown to Joann, Roger made Joann the sole beneficiary on a policy of life insurance. Following Roger's death, Joann received the proceeds of that life insurance policy in the amount of $270,212. Until Joann was contacted by Petitioner Andrea Simmons (hereinafter, "Simmons") after Roger's death and told to complete certain insurance forms, Joann had no knowledge of the existence of any life insurance policy in which she was named beneficiary. After receiving these proceeds, Joann wrote a check to the estate in the amount of $213,914.31, to provide it liquid assets. A portion

---

[4]     In reviewing the record, though all checks were drawn on bank accounts on which Roger was a signatory, at least four of the checks in evidence were signed by Petitioner Andrea Simmons. Andrea Simmons did not testify below, so it is unknown why she signed these checks.

of the balance of those proceeds was used by Joann to satisfy the balance on the BC Bank loan.

Following Roger's death, Simmons opened Roger's estate in Randolph County. On April 1, 2011, Joann filed her claims against the estate:[5]

1. $50,241.55, plus interest, for the unpaid balance on the loan Joann made to Roger which Joann obtained from BC Bank.

2. $36,094.03, plus interest, for the unpaid balance on the loan Joann made to Roger which Joann obtained from Freedom Bank.

On the same day, Joann also filed objections to the estate appraisement, raising issues as to the fair market value of certain tracts of real property owned by the estate and situated in West Virginia and Georgia.[6]

The issues raised by Joann's claims and objections were heard before Heather M. Weese, Special Fiduciary Commissioner of Randolph County, who conducted a hearing in Elkins on March 11, 2016. During this hearing, Joann detailed the arrangement she had with Roger. She would obtain loans from banks and then loan that money to Roger. Roger would pay the money he owed Joann directly to the banks.

During the hearing, the special fiduciary commissioner heard testimony from three certified general appraisers regarding the valuation of certain properties in West Virginia

---

[5] Only the claims at issue in this appeal are noted here. The total amount of monetary claims was $310,354.35.

[6] Though not noted by the parties, following the filing of the objections, the estate came before this Court on appeal on unrelated issues. *See Estate of Fussell v. Fortney*, 229 W. Va. 622, 730 S.E.2d 405 (2012).

4

and Georgia. For the West Virginia property, Joann called Wayne C. Hart, a certified general appraiser in the State of West Virginia, to testify regarding the fair market value of one 11.9 acre tract of land in Randolph County. Hart's written appraisal estimated fair market value as of June 15, 2011, eighteen months after Roger's death, to be $57,000. The special fiduciary commissioner found that, "Appraiser Hart testified that the sales market has been relative[ly] stable between the period of December 21, 2009, the decedent's date of death, and June 6, 2011, the appraisal value date, and he testified, to a reasonable degree of certainty, that the value would not vary more than 10%." Simmons called no one at the special fiduciary commissioner's hearing to rebut Hart's testimony, but, on the appraisement of estate form filed with the county commission,[7] she valued this property at $4,000, as of the date of Roger's death.

For the Georgia properties, Simmons called Dwain Bell, a certified general appraiser in the State of Georgia and Joann called Edward Scott Petty, also a certified general appraiser in the State of Georgia, to testify regarding the fair market value of two tracts of land in Bacon County, Georgia. The first contained 212.48 acres and the other contained 29.5 acres. Bell's written appraisals estimated fair market value of these two tracts as of December 21, 2009, the date of Roger's death, to be $398,900 for the 212.48 acre tract and $78,500 for the 29.5 acre tract. Petty's written appraisals estimated fair market value of the two tracts as of April 29, 2011, sixteen months after Roger's death, to

---

[7] "An executed and signed appraisement form is prima facie evidence . . . [o]f the value of the property listed . . . ." *W. Va. Code* § 44-1-14(g)(1) (2002).

be $595,000 for the 212.48 acre tract and $82,600 for the 29.5 acre tract. As to these written appraisals, the special fiduciary commissioner found "that market sales data [has] been stagnant between 2009 and 2011, and the values wouldn't have changed much."

On February 20, 2017, the special fiduciary commissioner issued a ten page written decision finding that the claims against the estate for the repayment of the loans Joann made to Roger were just debts of the estate, these loans fell within the statute of frauds,[8] and the statute's requirement of a writing was satisfied with Roger's endorsement of many checks.[9]

On the appraisal issues, the special fiduciary commissioner noted the lack of evidence presented by the estate and accepted the valuation of Joann's appraiser – $57,000 – as the fair market value of the West Virginia property. On the Georgia properties, the special fiduciary commissioner split the difference between the appraisals, and established fair market value of the 212.48 acre tract as $496,500 and fair market value of the 29.5 acre tract as $80,550.

Simmons appealed the special fiduciary commissioner's decision to the Randolph County Commission, which approved that decision by its order of April 20, 2017.

---

[8] The special fiduciary commissioner cited *W. Va. Code* § 55-1-1(a) (1990) as the applicable portion of the statute in its written decision. The circuit court affirmed this decision. As discussed in more detail below, and as briefed by the parties, we believe the provision of the statute of frauds at issue in this appeal is contained in *W. Va. Code* § 55-1-1(d) (1990).

[9] We are cognizant of the provisions of *W. Va. Code* § 48-29-301 (2001)(requirement of a writing for contract between husband and wife). As neither the parties, nor the circuit court, examined the applicability of this statute, we decline to do so.

6

Simmons then appealed the county commission's decision to the circuit court. By order dated February 7, 2018, the circuit court affirmed the county commission's decision.

## II. STANDARD OF REVIEW

"'In reviewing challenges to the findings and conclusions [found by a special commissioner that were adopted by the circuit court], a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a de novo review.' Syllabus Point 1, *Public Citizen, Inc. v. First National Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538 (1996) and Syllabus Point 1, *Napier v. Compton*, 210 W.Va. 594, 558 S.E.2d 593 (2001)." Syllabus Point 1, *Dodd v. Potomac Riverside Farm, Inc.*, 222 W. Va. 299, 664 S.E.2d 184 (2008).

We have also held that, "'[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.' Syllabus Point 6, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991)." Syllabus Point 4, *W. Va. Dep't. of Transp., Div. of Highways v. W. Pocahontas Props., L.P.*, 236 W. Va. 50, 777 S.E.2d 619 (2015).

7

### III.  ANALYSIS

As noted above, Simmons raises three issues in this appeal.  We will address each issue separately.

A.  Statute of Frauds

Simmons urges this Court to reverse the circuit court and find that, because there was no writing memorializing the agreement between Joann and Roger, their oral agreement was within the statute of frauds and is unenforceable.  We disagree with the circuit court's conclusion that the oral contract between Joann and Roger was within the statute of frauds, but was satisfied by Roger's many endorsements on checks.  However, we affirm the decision of the circuit court for different reasons.  *See Murphy v. Smallridge*, 196 W.Va. 35, 36–37, 468 S.E.2d 167, 168–169 (1996) ("An appellate court is not limited to the legal grounds relied upon by the circuit court, but it may affirm or reverse a decision on any independently sufficient ground that has adequate support."); *Longwell v. Hodge*, 171 W.Va. 45, 47, 297 S.E.2d 820, 822 (1982) ("We agree with the Circuit Court, and affirm its decision, although for different reasons than those expressed by the lower court.");  Syllabus Point 3, *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965) ("This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment.").

The circuit court adopted the special fiduciary commissioner's finding that the case of *Young v. Sehon*, 53 W. Va. 127, 44 S.E. 136 (1903), was dispositive of this issue.  We

8

disagree. *Young* was a case where a non-negotiable promissory note was endorsed on its back by two individuals. *Young*, 53 W. Va. 127, 128, 44 S.E. 136, 137. There was no question that there was a writing that contained some terms of the note. *Id.* The question in *Young* was not whether there was a writing within the statute of frauds, but whether parol evidence would be admissible "to show the relation of the parties to the note." *Young*, 53 W. Va. 127, 129, 44 S.E. 136, 137. This Court held that parol evidence would be admissible. *Id.,* Syllabus Point 1. The statute of frauds was not implicated.

To analyze the applicability of the statute of frauds, as that statute is one of the oldest laws still in effect, we feel compelled to briefly discuss the statute's history. The statute was first enacted by the British Parliament prior to the establishment of the United States, appropriately titled, "An Act for Prevention of Frauds and Perjuries." 29 *Chas. II*, c. 3 (1677). A portion of the 1677 statute provided:

> That from and after four and twenty day of June, which shall be in the year of our Lord one thousand six hundred seventy and seven . . . no action shall be brought whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person: . . . unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

*Id.*

The Virginia General Assembly adopted the statute of frauds in 1758. *See Beasley v. Owen*, 13 Va. (3 Hen. & M.) 449, 456 (1809). When West Virginia left the mother state, the statute of frauds became part of West Virginia law. *W. Va. Const. of 1863*, art. XI, §

9

8, *superseded by W. Va. Const. of 1872*, art. VIII, § 13. Over the years, there has been scant modification to the statute, and the Virginia and West Virginia statutes are still strikingly similar. *Compare Va. Code Ann.* § 11-2 (West 1990), *with W. Va. Code* § 55-1-1 (1990). The West Virginia version of the statute of frauds at issue in this appeal provides, in pertinent part:

> No action shall be brought in any of the following cases:
>      ….
> (d) To charge any person upon a promise to answer for the debt, default, or misdoings of another.
>      ….
> Unless the offer, promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby or his agent. But the consideration need not be set forth or expressed in the writing; and it may be proved (where a consideration is necessary) by other evidence.

*W. Va. Code* § 55-1-1(d) (1990). The purpose of the statute:

> [W]as intended as a shield for the innocent, not as a sword for the unconscionable. Whenever invocation of the statute of frauds in any instance ceases to be a shield and becomes an instrument whereby one seeks to escape the responsibilities of his word, and the evidence thereon is clear, the courts have acted wisely and courageously in stating that the act was not intended to cover such situations and have determined that in this instance a man's word should be held equal to his bond.

William O. Morris, *The Leading Purpose Doctrine as Applied to the Statute of Frauds*, 62 W. Va. Law Rev. 339, 340 (1960). One instance in which courts have made an exception to the statute of frauds is known as "The Leading Purpose Doctrine." *Id.* at 341. Under this doctrine, one must examine the oral contract and determine what its leading purpose is, to establish if the oral contract falls within the statute:

10

> Whether a promise to answer for a debt, for which the promissor was not otherwise liable, is or is not within the statute depends largely upon the intention of the parties. If it is intended that the promise is collateral, it is within the statute and must be in writing; if it is an original one, then it is not a promise to answer for another's debt, but to answer for the promissor's own debt and need not be in writing.

*Id.* at 340. Long before the formation of West Virginia, Judge Spencer Roane of the Court of Appeals of Virginia[10] squarely placed the leading purpose doctrine into the Virginia common law:

> Our act of frauds is precisely similar to that of *England* touching the point in question, and the distinction between an original and collateral promise has been often and solemnly settled in that country. That distinction seems to be this; that where the person on whose behalf the promise is made, is not discharged, but the person promising agrees to see the debt paid, so that the promisee has a double remedy, the promise is considered as *collateral* and must be in writing; but where the promiser undertakes to become the *paymaster* it becomes immediately *his* debt and he is liable without writing.

*Waggoner v. Gray's Adm'rs*, 12 Va. (2 Hen. & M) 603, 611-12 (1808). More recently, this Court recognized the continued applicability of the leading purpose doctrine:

> The statute of frauds is one noted for its brevity and the terseness of its language, yet it has claimed the attention of the courts of last resort, both in this country and in England, more often perhaps than any other law. It is practically the same in all the states. It was enacted to relieve persons and their estates against false and fictitious claims, by requiring the highest order of proof to establish liability in cases where it is sought to recover against a person as the mere voluntary surety or guarantor of another; but it has been perhaps as frequently invoked to avoid just liability as it has been relied upon to protect against injustice. The courts have said that it shall not

---

[10] Now known as the Supreme Court of Virginia.

11

be perverted and made the instrument of accomplishing a wrong, and have therefore in the vast majority of cases construed it to have no application in those cases where there is a consideration supporting the oral promise to answer for the debt or obligation of another, other than the release of the original obligor, or the extinguishment of the old debt, or promise. If the promisor derives a benefit from his oral promise which he did not otherwise have, his promise becomes a new and original one, and falls not within the purview of the statute.

*Howell v. Harvey*, 65 W. Va. 310, 314, 64 S.E. 249, 251 (1909). This Court went on to succinctly hold:

If a person make an oral promise to pay the debt of another in order to derive some benefit to himself thereby, which he did not otherwise have, such promise is an original undertaking and not within the statute of frauds; and in such case it matters not if the original promisor be not released.

Syllabus Point 2, *Howell,* 65 W. Va. 310, 64 S.E. 249 (1909); *Accord* Syllabus Point 3, *Tynes v. Shore*, 117 W. Va. 355, 185 S.E. 845 (1936)("Whether or not the promise of a person to pay a debt for which he was theretofore not liable is within the statute of frauds, depends on intention. If he intended the promise to be collateral, it is within the statute; if original, it is not."); Syllabus Point 2, *Hurst Hardware Co. v. Goodman*, 68 W. Va. 462, 69 S.E. 898 (1910)("If the main purpose of an oral promise by one person to pay a sum of money for which another is liable or may become liable is to secure a direct, personal, and pecuniary benefit to the promisor, the promise is original, and not within the statute of frauds, though such third person remain liable for the debt.").

Whether an oral promise is within or without the statute of frauds depends upon the question of whether such promise is original or collateral. An original promise is, "[a]n

oral promise to pay the debt of another, when supported by a new consideration beneficial to the promisor, [and] is not within the statute of frauds." Syllabus Point 1, *Mankin v. Jones*, 68 W. Va. 422, 69 S.E. 981 (1910). Conversely, "[a] collateral oral promise by one to pay another's debt is not binding where no benefit accrues to the person making such promise." Syllabus Point 5, *Mankin v. Jones*, 63 W. Va. 373, 60 S.E. 248 (1908).[11]

Under the facts of this case, this Court easily finds that the leading purpose of the oral agreement between Joann and Roger was an original promise between them and not within the statute of frauds. Joann obtained loans from two different banks solely in her name. She was solely responsible to the banks for the repayment of these loans. Joann then loaned the entire proceeds of these loans to Roger, because Roger did not have sufficient credit to obtain loans from banks. Roger's agreement with Joann was not to act as collateral for Joann's loans with the banks, but to pay the money he owed Joann directly to the banks, instead of to Joann. Because there was no written agreement between Roger and the banks, they would have had no recourse against Roger for the repayment of Joann's loans. If there was such an agreement, it would have been a collateral agreement, where Roger assumed Joann's loans with her creditor. Such an agreement would fall within the statute of frauds, and be unenforceable.

This important distinction is the key to understanding that Joann's agreement with Roger was separate from her loans from the banks. Because Roger did not act as collateral

---

[11]    *Mankin v. Jones* was twice appealed to this Court. *See Mankin v. Jones*, 68 W. Va. 422, 69 S.E. 981 (1910) and *Mankin v. Jones*, 63 W. Va. 373, 60 S.E. 248 (1908).

13

on Joann's loans with the banks, this makes Roger and Joann's oral agreement separate and distinct. This separate agreement was supported by its own consideration, where Joann loaned money to Roger that he could not have otherwise obtained from banks, in exchange for Roger paying the money he owed Joann directly to the banks.

Therefore, the leading purpose of Joann's oral agreement with Roger was an original promise, separate and distinct from Joann's contracts with the banks, outside the statute of frauds, and is enforceable.

B. Creditor Beneficiary

The next argument made by Simmons is that Joann was a creditor beneficiary of Roger's life insurance policy, and that the proceeds from that life insurance policy satisfied any debt owed from Roger to Joann. In support of that argument, Simmons points to dicta in *Pettus v. Olga Coal Co.*, 137 W. Va. 492, 72 S.E.2d 881 (1952), which Simmons argues establishes Joann as a creditor beneficiary of Roger's life insurance policy:

> Third persons [sic] beneficiaries under a contract, although not parties to it, may be divided into three classes: (1) Such person is a donee beneficiary if the purpose of the promisee in obtaining the promise of all or part of the performance thereof, is to make a gift to the beneficiary, or to confer upon him a right against the promisor to some performance neither due [nor supposed] or asserted to be due from the promisee to the beneficiary; (2) such person is a creditor beneficiary if no intention to make a gift appears from the terms of the promise, and performance of the promise will satisfy an actual [or supposed] or asserted duty of the promisee to the beneficiary; (3) such person is an incidental beneficiary if the benefits to him are merely incidental to the performance of the promise

14

and if he is neither a donee beneficiary nor a creditor beneficiary.

*Pettus*, 137 W. Va. 492, 497, 72 S.E.2d 881, 884 (1952).

This position, however, is not consistent with the law of creditor beneficiaries on life insurance policies in West Virginia. Under Legislative Rule, credit life insurance is established as a special line of insurance. *See W. Va. C.S.R.* § 114-6-2 (1995).[12] The Legislative Rule provides, "'Credit Life Insurance' means insurance on the life of a debtor pursuant to or in connection with a specific loan or other credit transaction." *Id.* § 114-6-2.1 (1995). To carry credit life insurance, the insurance commissioner requires insurance companies to have certain information on the face of their policies or certificates of insurance:

> Each individual policy or group certificate of credit life insurance and/or credit accident and sickness insurance shall, in addition to other requirements of law, set forth (i) the name and home office address of the insurer, (ii) the names of the debtor or in the case of a certificate under a group policy, the identity by name or otherwise of the debtor, (iii) the premium or amount of payment, if any, by the debtor separately for credit life insurance and credit accident and sickness insurance, (iv) a description of the coverage including the amount of term thereof and any exceptions, limitations and restrictions, and (v) shall state that the benefits shall be paid to the creditor to reduce or extinguish the unpaid indebtedness. When the amount of insurance exceeds the unpaid indebtedness, any excess shall be payable to a beneficiary, other than the creditor, named by the debtor or to his or her estate.

---

[12] The 1995 version of this rule was in effect as of Roger's death. The 2011 version made cosmetic changes to this rule.

15

*Id.* § 114-6-5.2 (1995). No evidence was presented below demonstrating that Roger's life insurance policy contained the information required by the Legislative Rule, to legally create a credit life insurance policy. Particularly, there was no evidence adduced showing that on the face of Roger's life insurance policy there was information "stat[ing] that the benefits [of Roger's life insurance policy] shall be paid to [Joann] to reduce or extinguish the unpaid indebtedness [between Roger and Joann]." *Id.* This analysis is bolstered by the finding of the special fiduciary commissioner that, "[t]he life insurance policies [sic] proceeds received by [Joann] as beneficiary thereunder were payable to her irrespective of this claim, as a non-probate asset beneficiary, and it was well within her ownership of them to satisfy any outstanding debts, including this one. Had [Roger] lived to fully satisfy the debt . . . [Joann] would have personally pocketed [the] full claim." Accordingly, we can only conclude that, as a matter of law, the life insurance purchased by Roger was not a credit life insurance policy and Joann was not a creditor beneficiary under that life insurance policy.

C. Date of Death Appraisal

Simmons' final argument alleges that Joann's fair market value written appraisals of properties in West Virginia and Georgia should not have been considered by the special fiduciary commissioner because they were not date of death appraisals, as required by *W. Va. Code* §44-1-14(b):

> After having taken the appropriate oath, the personal representative shall, on the appraisement form prescribed by

16

the tax commissioner, list the following items owned by the decedent or in which the decedent had an interest and the fair market value of the items at the date of the decedent's death.

*W. Va. Code* § 44-1-14(b) (2002).[13] Simmons points to our decision in *West Virginia Department of Transportation, Division of Highways v. Western Pocahontas Properties, L.P.*, 236 W. Va. 50, 777 S.E.2d 619 (2015)("*WPP*"), in support of her argument that the offered written appraisals should not have been considered by the special fiduciary commissioner.

In *WPP*, the appraisal that the trial court excluded "failed to follow the basic methodology employed by an expert in the field of property appraisals, and based his opinion on information that had no established relevance or reliability." *WPP*, 236 W. Va. 50, 74, 777 S.E.2d 619, 643. The comparable sales in *WPP* were gleaned from the internet and were of coal sales in Indonesia and Australia. *Id.*

Here, we have no such issue with the methodology employed by Joann's appraisers. All three of Joann's written appraisals established fair market value of the appraised properties at a different date than that of Roger's death – December 21, 2009. The West Virginia written appraisal offered by Joann had an effective date of June 15, 2011 – eighteen months after Roger's death. The two Georgia written appraisals offered by Joann had an effective date of April 29, 2011 – sixteen months after Roger's death.

---

[13] The current version of this code section was adopted by the Legislature in 2014. The 2002 version was in effect as of Roger's date of death, and is thus the operative version of the statute for consideration in this appeal. We would note that the only difference between the 2002 version and the 2014 version is that the term "Tax Commissioner" is capitalized in the 2014 version.

17

In *WPP*, we held that "'[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.' Syllabus Point 6, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991)." Syllabus Point 4, *WPP*. Unlike *WPP*, the special fiduciary commissioner made specific factual findings regarding the testimony adduced from Joann's appraisers, which demonstrates why the written appraisals were properly considered.

On the West Virginia written appraisal she found, "Appraiser Hart testified that the sales market has been relative[ly] stable between the period of December 21, 2009, the decedent's date of death, and June 6, 2011, the appraisal value date, and he testified, to a reasonable degree of certainty, that the value would not vary more than 10%." On the Georgia written appraisals she found, "that market sales data have been stagnant between 2009 and 2011, and the values wouldn't have changed much."

Interestingly, the Georgia Court of Appeals was faced with a strikingly similar factual circumstance:

> Appellant moved to strike Hicks' testimony because the effective date of his valuation was January 1, 1989, which was after the date of the taking, August 25, 1988. Appellant contends that this was erroneous because it did not give consideration to the fact that the construction project itself could have lowered values in the area.
>
> . . . .
>
> Hicks stated that *he was aware of nothing that occurred between the date of the taking and the date of his appraisal to make any difference in his valuation. He also stated that in his*

18

> *opinion the values were valid on August 25, 1988.* Appellant's objection is without merit.

*Skipper v. Dep't of Transp.*, 399 S.E.2d 538, 542 (Ga. App. 1990)(emphasis added). We believe the reasoning of the Georgia Court of Appeals is sound in recognizing that if competent expert testimony validates an otherwise admissible written appraisal as of a certain date, the written appraisal, coupled with the testimony, may be considered by the trier of fact.

Joann's appraisers provided oral testimony that validated the fair market values in their written appraisals as of Roger's date of death. Accordingly, we find no error.

## IV. CONCLUSION

For the reasons stated above, we affirm.

Affirmed.

19